UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DR. ROBERT DIBIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: 1:20-cv-471 |
| v. | ) |
| | ) |
| INDIANA UNIVERSITY – KOKOMO, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**I.   STATEMENT OF THE CASE**

1. Plaintiff, Dr. Robert Dibie (hereinafter "Dibie" or "Plaintiff"), brings his Complaint against Defendants, Indiana University - Kokomo (hereinafter "IUK"), for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* Dibie contends he was subjected to discrimination based on his race, African American, national origin, and retaliation after raising concerns of unfair treatment of minorities, lack of diversity in marketing materials, and unfair policies and procedures at the University.

**II.   PARTIES**

2. Dibie resides within the geographical boundaries of the Southern District of Indiana.

3. Indiana University Kokomo is a public university with a principal office address of, 2300 South Washington Street, Kokomo, Indiana 46902.

**III.   JURISDICTION AND VENUE**

4. Dibie was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

5. IUK is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

1

6. Dibie satisfied his obligation to exhaust his administrative remedies by having timely filed his U.S. Equal Employment Opportunity Commission Charge Number 470-2019-04403 against IUK alleging discrimination in violation of the Civil Rights Act of 1964, as amended, because of his race. Dibie received his Dismissal and Notice of Suit Rights from the EEOC on November 15, 2019, and timely files his Complaint prior to February 13, 2019.

7. Jurisdiction is conferred on this Court by Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as all events, transactions and occurrences concerning this matter have arisen in the geographical purview of the Southern District of Indiana.

## IV.   FACTUAL ALLEGATIONS

### A.  Promotional video for Master of Public Management Program (Spring 2016)

9. In the Spring of 2016 IUK created a marketing video that was intended to advertise the Master of Public Management (MPM) Program, a program that Dr. Dibie created in 2006 while he was Dean of the School of Public and Environmental Affairs (SPEA).

10. In the Spring of 2016, Dr. Dibie was the only African American and the only senior tenured full professor teaching in the program.

11. When the video was released, there were only two faculty members who were featured in the video. Both were non-tenure track lecturers, junior to Dr. Dibie, and both are white.

12. Dr. Dibie questioned the videographer, Mike Glassburn, why he had not come to his office for the scheduled filming.

13. Mr Glassburn responded in disrespectful manner, advising Dr. Dibie that he was not his boss.

14. Dr. Dibie sent a letter to Mr. Glassburn's supervisor expressing his displeasure that Mr. Glassburn had failed to include him in the video and then was disrespectful when he asked him about it.

15. Dean Krabbenhoft found out about Dibie's letter to Glassburn's boss, and reprimanded Dibie.

16. Krabbenhoft also requested that Dibie apologize to Glassburn, the white staff member that had insulted and disrespected him.

17. Krabbenhoft later requested that another video be made that was racially inclusive. However, that video was never posted on the IUK website.

### B. Retaliation after the video incident – Fall 2016

18. In the Fall of 2016, Dibie was one of three applicants for a Campus Research Award.

19. All applicants for the award were required to submit a dossier to a Review Committee comprised of 5 faculty members.

20. Dibie submitted his Faculty Research Award Dossier to the office of Vice Chancellor, Mark Canada where the dossiers were housed for review by the Committee members.

21. Canada was not on the committee that was to select the winner, although Canada did have access to the dossiers of each applicant as they were being stored in his office.

22. Dibie was later informed by the committee chairman that Canada had advised the committee not to consider Dibie's dossier as he alleged it contained plagiarized material.

23. Specifically, Canada alleged that Dibie had plagiarized Canada's Curriculum Vitae ("CV").

24. When questioned about this by the selection committee, Dibie was confused because the dossier that he submitted did not even contain a CV, nor was it required as part of the dossier.

25. Dr. Dibie later discovered that a bogus Cirriculum Vitae ("CV") was inserted into his dossier.

26. Dibie had not included a CV in his dossier because a complete CV was not required in the materials to be reviewed by the Committee.

27. The committee chair, Dr. Kasem Kasem, later confirmed that three or four of the five Committee members also confirmed that they had not seen any CV in Dibie's dossier.

28. One of the committee members, Dr. Ligaya McGovern, later made the following statement under oath:

    *"The Research Award Committee did the right thing: to apply the rubric we have been using consistently all these years to the three candidates/applicants. The result clearly shows who got the score that is closest to the total score and who is the qualified candidate for the award."*

    *The following scores (out of 500) were given to the applicants:*
    *a. Dr. Robert Dibie 425/500*
    *b. Dr. David Hancook 350/500*
    *c. Dr. Lance Mason 349/500*

    *"Second, the question can be raised: why was this particular applicant singled out for a pre-review by someone outside the search Award Committee who are the only ones authorized to look at their dossier for review and come around raising issues and accusation/allegations that the applicant was not made aware of before these are brought before the Research Award Committee? The issue of protecting the security of the dossier can come in here, but also possibly a discrimination issue."*

29. Whoever inserted the bogus CV went to great lengths to make the inclusion appear to be intended by Dr, Dibie, in that they also substituted an altered Table of Contents, including the attachment of a "resume."

30. Canada, who was not supposed to be involved in the review process, violated established procedures by attending a meeting of the Committee and introducing issues from the bogus CV.

31. Canada told the Committee that Dibie had put a CV into his dossier that had been plagiarized from Canada's CV and requested that the Committee remove Dibie as a candidate for the research award.

32. The Research Award Committee refused Canada's request to remove Dibie as a candidate.

33. Dibie's CV is 39-40 pages of credentials and accomplishments that he has earned over the course of his academic career and of which he is very proud.

34. When Dibie later confronted Canada to provide a copy of the bogus CV, Canada refused.

35. Dibie has reason to believe it was Canada who inserted the bogus CV into his dossier, as Canada was one of a very few people who had access to both Dibie's CV and his Research Award Dossier.

36. Of the 3 applicants for the award, Dr. Dibie scored the highest.

37. After the Faculty Research Award Committee had evaluated and scored the three applicants' dossiers and following Canada's visit to a Committee meeting, one of the Committee members, Dr. Patrick Motl, introduced controversy about an article Dibie published in 1999.

38. This was particularly unusual as the Committee was tasked with reviewing only evidence of research productivity of the past five years (2010-2016) as provided to the Committee in the dossiers submitted by the candidates.

39. The only way that Motl would have had access to this information is from Dibie's confidential personnel file, which would have come from Dr. Canada.

40. Canada had knowledge of the contents of Dibie's personnel file including confidential issues dating back two or more decades and Canada controlled access by others to his file. Furthermore, Canada had motive to provide Dr. Motl with documentation from Dibie's file that, taken out of context, might be used to discredit him. After all, it was following Canada's unsuccessful request to the Committee that Dibie be removed from the candidate pool that Dr. Motl shared the 1999 article issue in a subsequent meeting of the Committee.

41. Further, Dr. Motl failed to disclose to the committee that Dibie had been exonerated of the allegations related to his 1999 journal article.

42. In fact, the issue was investigated and closed by Vice Chancellor, Stuart Green, in 2006. Indeed, after this publication incident, Green was so satisfied with Dibie's record that he promoted him from Assistant Dean to Dean of the School of Public and Environmental Affairs (SPEA) in 2007.

43. The fact that partial documentation was presented by Dr. Motl in such a way as to shed a negative light on Dibie's character while the rest of the documentation was withheld can only lead to the conclusion that there was malicious intent.

44. On or about December 13, 2016, Dean Alan Krabbenhoft interjected himself into the selection process for the Faculty Research Award, and sent Dibie an email stating, "*Robert, I will like to talk with you briefly about your research award application tomorrow afternoon*".

45. On December 14, 2016, Krabbenhoft sent a second email to Dibie stating, *"Robert, I just wanted to drop you a note that I no longer need to meet with you. Apparently, the question cleared itself up."*

46. Canada and Krabbenhoft's interference with the selection committee is a violation of the established procedure of the Academic Affairs Office for consideration of the Research Award.

47. In the end, the Committee ultimately recommended that Dibie receive the 2016 Faculty Research Award; however, Canada blocked him by refusing to make the 2016 Award.

48. As a result, Dibie was denied both the honor and the monetary prize associated with the Faculty Research Award.

49. Dibie was the only African American ever to be selected by the Committee to receive the Research Award and would have been the only African American to receive it had Canada not blocked him from receiving it.

50. The actions of Krabbenhoft and Canada in blocking Dibie's receipt the 2016 Faculty Research Award were in retaliation for Dibie's complaints about the racial inequities of excluding him from the MPM video.

51. When Dibie complained to Canada and Krabbenhoft about being denied the 2016 Faculty Research Award, they further retaliated against him.

52. On April 28, 2017, Krabbenhoft wrote a negative evaluation of Dibie's 2016 Faculty Annual Report (FAR). In his narrative, Krabbenhoft omitted, marginalized and/or discredited most of Dibie's accomplishments while he reprimanded Dibie for his past complaints of discrimination.

53. Specifically, Krabbenhoft made the following comment in Dibie's 2016 FAR:

> *Unfortunately, in 2016 there was another aspect of service you were involved with that was not handled in a professional manner and which cannot be ignored. The matter in question involved the creation of the video for the MPM program. Following the review of the preliminary draft you took on a very confrontational manner with Mike Glassburn who was the videographer who film and edited the clip. While I understand from the discussion around the time and the displeasure*

> *in not being included in the video and the feelings you may have had with regards to being excluded such, you took it directly to Mike and also made strong accusation related to the reasoning behind not being included in the initial clip. As I informed you, I myself was not happy with the first draft of the video based upon it not including you. However, my tact would have been, and was even after your accusation and outburst, to ask them to re-shoot certain portions to include you as part of the video. They did such following my request and I believe the final product was good and does a very nice job reflecting the MPM. While I realize you have indicated that you put this behind you, as I have, I cannot ignore this incident and as such I rate your service as only Satisfactory".*

54. The negative evaluation in his 2016 FAR, resulted in a denial of merit pay to Dibie.

55. In response, Dibie filed a Faculty Grievance in August 2017, and the retaliation escalated.

56. On the very day that Dibie filed his grievance, Krabbenhoft retracted his approval of Dibie's request to travel abroad to conduct research. Dibie had already purchased his plane ticket.

57. Krabbenhoft's actions resulted in Dibie having to pay for his research travel expenses out of his own pocket instead of receiving the normal support from the University.

58. In the Summer of 2017, Krabbenhoft also prevented Dibie from teaching a summer graduate course costing him summer teaching pay.

59. On April 11, 2017, an anonymous report was filed with the University's Academic Integrity Office accusing Dibie of Academic Misconduct. That anonymous complaint again alleged that Dibie had plagiarized Canada's CV.

60. Since that time, Dibie has been faced with proving his innocence while those making the false claims against him remain anonymous and are protected by confidentiality.

61. The retaliation had become so severe that Dibie's career, livelihood, and reputation were threatened as serious false accusations of academic misconduct had been made against him to the upper levels of Indiana University's Administration.

62. In response to the continued retaliation, in December 2017, Dibie filed an internal IUK Equal Employment Opportunity (EEO) Complaint with the university's Affirmative Action Office.

63. Even though Dibie's EEO Complaint named Krabbenhoft and Canada as respondents, the EEO office denied Dibie's request for an impartial reviewer for his 2017 FAR.

64. The EEO Office also violated the Department of Public Administration and Health Management (PAHM) Faculty handbook policy by asking Krabbenhoft to rate Dibie's 2016 research initiatives (3 journal publications) in 2018 (two years after) as "satisfactory." Page 32 of the Faculty Handbook policy requires PAHM or SPEA faculty to publish one journal article to receive a rating of excellent each year.

65. The IUK EEO Office dismissed Dibie's EEO Complaint on April 13, 2018, and Dibie filed an appeal to the Chancellor of the University, Susan Sciame-Giesecke on August 30, 2018.

66. On or about October 18, 2018, Chancellor Sciame-Giesecke replied to Dibie's August 30, 2018 letter of appeal in which she simply stated that she was "upholding the findings of the affirmative action investigation".

67. On the same day that Chancellor Sciame-Giesecke dismissed Dibie's EEO Appeal, Canada denied Dibie's application for sabbatical leave in the 2019 Fall Semester.

68. Canada continues to use the on-going investigation of the "anonymous" research misconduct allegation as the basis for denying Dibie the sabbatical leave to which he would normally be entitled.

69. By all measures it would appear that Canada is the person who anonymously reported Dibie to the Office of Research Misconduct, as the allegations are that Dibie plagiarized Canada's CV.

70. In August 2019 Indiana University Kokomo published a magazine with the title "IU Kokomo Discovery Booklet Publication to Showcase 75 years of Faculty Research." Despite the fact that Dibie had published 10 books and more than 80 journal articles and none of Dibie's white colleagues have attained the same number of published works like him, Canada and Krabbenfoft did not include Dibie in the above publication. Instead a junior faculty in Dibie's department with only 7 journal publications was selected for inclusion in the "75 years of Faculty Research" publication. In fact, most of the well published African American or black faculty at IU Kokomo were not included in the publication either.

71. IU Research Misconduct Policy Violation (ACA-30) – The IU integrity office did not run a plagiarism check on the two other white candidates that also applied for the 2016 Faculty Research Award. Dibie, the only African American faculty was single out for the plagiarism check.

## V. LEGAL ALLEGATIONS

### A. Count 1 – IUK - Employment discrimination based on race

72. Dibie hereby incorporates paragraphs one (1) through (71) as set forth herein.

73. Dibie was excluded from a marketing video regarding the MPM Program in the Spring of 2016.

74. In the Spring of 2016, Dr. Dibie was the only African American and the only senior tenured full professor teaching in the Program.

75. When Dibie complained about being excluded from the video based on his race, he was retaliated against by his supervisors, Canada and Krabbenhoft.

76. Dibie was denied the Faculty Research Award despite being the most qualified applicant.

77. Dibie has been charged with plagiarizing Canada's CV, after an anonymous complaint was filed with the University's Research Integrity Office.

78. As a result of the actions of IUK and Vice-Chancellor Canada, and Dean Krabbenhoft, Dibie has sustained damages including but not limited to economic loss, loss of reputation, loss of enjoyment of life, mental anguish and emotional injury.

79. IUK's actions and omissions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended.

**B. Count 2 – IUK -Retaliation**

80. Dibie hereby incorporates paragraphs one (1) through (74) as set forth herein.

81. Dibie raised concerns regarding unfair treatment of minorities, and lack of inclusion of minorities in the MPM marketing video.

82. IUK, by and through the actions of its Vice Chancellor, and Dean of Academic Affairs retaliated against Dibie by interfering in his application for the Faculty Research Award, giving Dibie negative reviews, accusing him of academic misconduct, preventing him from conducting research abroad, and restricting his sabbatical and summer teaching schedule.

83. IUK's actions and omissions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended.

## VI. REQUESTED RELIEF

WHEREFORE the Plaintiff, Dr. Robert Dibie, requests that judgment of this Court be held in his favor as follows:

1. Order IUK to pay Dibie any and all lost wages and the monetary value of all benefits associated with his employment as a result of IUK's discrimination;

2. Order IUK to pay Dibie compensatory damages for the mental anguish and consequential harm he suffered;

3. Order IUK to pay Dibie's reasonable attorney fees and costs;

4. Order IUK to pay interest on all sums recoverable; and

5. Award to Dibie all other relief that is just and proper.

Respectfully submitted,

GOODIN ABERNATHY, LLP

/s/ Christopher E. Clark
Christopher E. Clark, #18577-29
*Attorney for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff, Dr. Robert Dibie, by counsel, demands a trial by jury on all issues deemed so triable.

Respectfully submitted,

GOODIN ABERNATHY, LLP


/s/ Christopher E. Clark
Christopher E. Clark, #18577-29
*Attorney for Plaintiff*




Christopher E. Clark, Atty No. 18577-29
GOODIN ABERNATHY, LLP
301 East 38th Street
Indianapolis, IN 46205
P: 317/843-2606
F:  317/574-3095
cclark@goodinabernathy.com
03-096